2024 PA Super 129

| | | |
|---|---|---|
| TEDESCO EXCAVATING & PAVING, INC. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| FWH DEVELOPMENT, LLC | : : | |
| Appellant | : : | No. 995 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 1, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 19-006017

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

CONCURRING AND DISSENTING OPINION BY BOWES, J.: **FILED: June 24, 2024**

I concur with my learned colleagues' decision to affirm the jury verdict in favor of Tedesco Excavating & Paving, Inc. ("Tedesco") and against FWH Development, LLC ("FWH") for breach of contract. However, I disagree with the majority's creative statutory construction of the Contractor and Subcontractor Payment Act ("CASPA") to extend the application of the act's penalty provisions to contractors and subcontractors who are seeking unliquidated damages for breach of contract as opposed to payment for work

actually performed.[1]  As characterized by the trial court, "this case dealt with a los[t] profit on the job that Tedesco contracted for but did not perform[.]" Trial Court Opinion, 4/8/23, at 5.  Thus, notwithstanding the majority's broad application of CASPA under the guise of statutory construction, I would conclude that, while Tedesco may be entitled to six percent interest pursuant to the terms of its contract and post-judgment interest at the legal rate as determined by the Pennsylvania Judicial Code,[2] it is not entitled to the supplementary awards of augmented interest (12%), counsel fees, and litigation costs pursuant to the provisions outlined in CASPA.

_____

[1] Blacks Law Dictionary defines unliquidated damages as "Damages that cannot be determined by a fixed formula and must be established by a judge or jury."  Unliquidated Damages Definition, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw.  Here, Tedesco sought the anticipated thirty-five percent profit and overhead on the project as outlined in the contract; however, it was still required to satisfy its burden of proving that amount to the jury.  **See** Majority Opinion at 21-23.

[2] Specifically, 42 Pa.C.S. § 8101 provides, "Except as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award."

As to the allotment of attorney fees and expenses, Pennsylvania generally applies the American Rule, which provides, "absent an express agreement or statutory authority to the contrary, litigants presumptively are responsible for their own costs and attorney's fees."  **Clean Air Council v. Dep't of Envtl. Prot.**, 289 A.3d 928, 934 n.19 (Pa. 2023); **Mosaica Acad. Charter Sch**. **v**. **Com. Dep't of Educ.**, 813 A.2d 813, 822 (Pa. 2002).  CASPA is an exception to this rule.  As explained in the body of this dissenting opinion, in my view, CASPA does not provide a basis for those expenses in this breach-of contract litigation.

Our Supreme Court recently reiterated the components of statutory construction as follows:

> The Statutory Construction Act of 1972 (Statutory Construction Act) provides that the object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). Generally, the plain language of the statute "provides the best indication of legislative intent." ***Miller v. Cnty. of Centre***, 643 Pa. 560, 173 A.3d 1162, 1168 (2017) (citing 1 Pa.C.S. § 1921(b)). If the statutory language is clear and unambiguous in setting forth the intent of the General Assembly, then "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." ***Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n***, 603 Pa. 452, 985 A.2d 678, 684 (2009) (citing 1 Pa.C.S. § 1921(b)). In this vein, "we should not insert words into a statute that are plainly not there." ***Frazier v. Workers' Comp. Appeal Bd. (Bayada Nurses, Inc.)***, 616 Pa. 592, 52 A.3d 241, 245 (2012).

***Commonwealth v. Lehman***, ___ A.3d ___, 2024 WL 1201184, at *4 (Pa. Mar. 21, 2024) (footnote omitted).

As it relates to ambiguity, the High Court explained,

> A statute is ambiguous when it is susceptible to . . . at least two reasonable interpretations. While we must consider the statutory language in its full context before we assess ambiguity, **we must not overlabor to detect or manufacture ambiguity where the language reveals none**. We strive to give effect to each word.

***Greenwood Gaming & Entm't, Inc. v. Dep't of Revenue***, 306 A.3d 319, 329 (Pa. 2023) (cleaned up) (citations and quotations omitted) (emphasis added).

Instantly, the majority ponders why, in enacting CASPA, the General Assembly would intend to punish obligors for breaching after performance "but not also intend to punish obligors for materially breaching before

- 3 -

performance[?]" Majority Opinion at 27. While the majority goes to great lengths to divine the proposed legislative intent, the answer to the inquiry is remarkably obvious from the plain and ordinary language of the statute: "Performance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle the contractor or subcontractor to payment from the party with whom the contractor or subcontractor has contracted." 73 P.S. § 504. While CASPA does not define performance, "the lack of statutory definitions does not preclude a plain-language analysis[.]" *Greenwood Gaming & Entm't*, 306 A.3d at 331. Hence, the crux of § 504 is that performance entitles a contractor to payment.

While the majority focuses on the fact that § 504 does not exclude its novel interpretation, nothing in the plain language of the Section 504 (or any other section) endorses it. The foregoing statutory language conveys a clear and definite meaning: performance is the *sine qua non* that entitles the contractor to payment and the economic sanctions outlined in the subsequent sections of the statute.

Indeed, § 504 embodies the oft-cited principle that CASPA was enacted to

> cure abuses within the building industry involving payments due from owners to contractors, contractors to subcontractors, and subcontractors to other subcontractors. The underlying purpose of CASPA is to protect contractors and subcontractors and to encourage fair dealing among parties to a construction contract. **The statute provides rules and deadlines to ensure prompt payments, to discourage unreasonable withholding of payments, and to address the matter of progress payments**

- 4 -

**and retainages**. Under circumstances prescribed in the statute, interest, penalty, attorney fees and litigation expenses may be imposed on an owner, contractor or subcontractor who fails to make payment to a contractor or subcontractor in compliance with the statute.

***Prieto Corp. v. Gambone Const. Co.***, 100 A.3d 602, 607 (Pa.Super. 2014) (emphasis added).

The remedial nature of the statutory scheme does not nullify the plain and ordinary meaning of "performance." CASPA clearly and unambiguously requires that a contractor or subcontractor perform work in order to invoke the protections and remedies that the act provides. By way of example, within months of executing the July 2015 construction contract, Tedesco acquired signal poles for the project and submitted Payment Application No. 1 to FWH seeking $56,873.84 compensation for that performance, which was paid by FWH. ***See*** N.T. Trial Volume Three, 5/11/22, at 314-21, 363. Had FWH failed to pay Tedesco for its performance and Tedesco sued for recompense, CASPA would have undoubtedly applied. However, that is not the posture of this case because, as explained *infra*, the instant litigation does not involve the non-payment of an invoice for performance. Instead, it concerns a dispute over the breadth of damages for FWH's breach of the construction contract.

Significantly, this is not a case that turns upon an ambiguous definition of "performance" or even one that requires us to consider whether Tedesco's actions should be deemed tantamount to performance. However, rather than interpret the statute as written, the majority finds ambiguity because the plain

and ordinary language of the statute does not contemplate the desired application under the facts presented in this case. It reasons "[n]othing in the plain language of Section 504 (or any other section) excludes anticipatory-repudiation claims from the statutory coverage." Thus, instead of accepting the clear **omission** of any non-performance-based entitlement to the statutory remedies as the facial exclusion that it is, the majority ignores the unmistakable performance-entitles-payment edict and manufactures a perceived ambiguity for the express purpose of extending the penalty provisions to instances where, as here, no party has ever withheld payment for any work performed. ***See*** Majority Opinion at 26-27.

The majority's rationale runs counter to the general doctrine of *expressio unius est exclusio alterius*, or "the inclusion of a specific matter in a statute implies the exclusion of other matters." ***Mimi Investors, LLC v. Tufano***, 297 A.3d 1272, 1286 n.21 (Pa. 2023) (quoting ***Thompson v. Thompson***, 223 A.3d 1272, 1277 (Pa. 2020). Stated differently, CASPA requires payment for work, services, and materials provided on eligible construction projects and affords penalty interest, fees, and costs to a contractor or subcontractor if those payments are withheld. Insofar as CASPA does not implicate disputes over the amount of damages owed for a parties' breach of contract, the statutory framework does not sustain the majority's strained construction in favor of Tedesco's claim for attorneys' fees and interest in this case.

Even if CASPA could be interpreted as not requiring performance, the statute's penalty provisions are clearly triggered by an owner's failure to satisfy a request for payment. **See e.g.**, 73 P.S. § 505(d) Interest ("[I]f any progress or final payment to a contractor is not paid within seven days of the due date . . ., the owner shall pay the contractor, beginning on the eighth day, interest at the rate of 1% per month . . . on the balance that is at the time due and owing); 73 P.S. § 512(a) and (b) (concerning additional twelve percent penalty interest, attorneys' fees and litigation costs where "it is determined that an owner, contractor or subcontractor has failed to comply with the payment terms of this act[.]").  In the majority's view, FWH's failure to pay was founded on Tedesco's submission of Payment Application No. 2.  It determined thusly,

> On April 24, 2019, Tedesco provided FWH Application for Payment #2 for Final Payment, which detailed the lost overhead and profits that Tedesco sought in the wake of FWH's anticipatory repudiation and material breach.  Upon Tedesco's application for final payment, according to Article 5.2 of the contract, FWH "shall pay the remainder of the Contract Price[.]

Majority Opinion at 28-29.  Hence, according to the majority, CASPA applied in this case because FWH failed to satisfy Payment Application No. 2., which demanded payment for its lost overhead and profit margin in the amount of $383,776.17.  **See** Payment Application No. 2; Amended Complaint, 11/11/19, at 5; Exhibit 4.

However, contrary to the majority's suggestion, the instant litigation does not stem from FWH's failure to satisfy Payment Application No. 2.

Indeed, the certified record demonstrates that Tedesco submitted Payment Application No. 2 to FWH **after** filing the instant breach of contract action, wherein it sought breach of contract damages representing its lost overhead and profit in the identical amount of $383,776.17. **See** Complaint 4/23/19 at 6 ("WHEREFORE, Tedesco Excavating & Paving, Inc., demands judgment in its favor and against FWH Development, LLC in the amount of $383,776.17"). The fact that the lawsuit was filed prior to the submission of Payment Application No. 2 was subsequently confirmed by Jonathan Tedesco's trial testimony indicating that the pay application was, in fact, backdated and submitted to FWH after it had already initiated this litigation. N.T. Trial Volume Three, 5/11/22, at 364. Thus, it is no surprise that Tedesco's complaint for breach of contract neither referred to Payment Application No. 2 nor included it among the other documents attached as exhibits.

Having received the complaint alleging breach of contract and seeking damages for lost overhead and profit margin, FWH demurred to the identical allegations in Payment Application No. 2. Instead, it filed preliminary objections to the complaint on two grounds that are relevant to this appeal. First, FWH disputed Tedesco's entitlement to lost profit damages under Article 15.4.4 of the General Conditions of the contract, which specifically precluded Tedesco from recovering anticipated lost profits and overhead in the situation that FWH asserted. **See** General Conditions of Contract Article 15.4.4 ("CONTRACTOR shall not be paid on account of loss of anticipated profits or

revenue or other economic loss arising out of or resulting from such termination"). **See e.g.**, Preliminary Objection to Complaint, 6/4/19, at 7 ¶39 ("The damages [Tedesco] claims in its Complaint, namely, its alleged lost profits on work not performed, are not recoverable under the Contract.").

Second, noting the obvious omission of a reference to a pay application or invoice, FWH highlighted that Tedesco failed to plead the facts to support a claim for a violation of CASPA. **Id**. at 9 ¶48 ("[Tedesco] has not pleaded damages resulting from FWH's failure to pay upon any particular progress payment application or invoice, but rather has pleaded damages relating to lost profits on work not performed due to FWH's exercise of its contractual right to suspend the Project"). Prior to the date scheduled to hear argument on FWH's preliminary objections, Tedesco filed an amended complaint that, for the first time, referenced Payment Application No. 2 in relation to its request for the breach of contract damages in the amount of $383,776.17 and attached the payment application listing the identical figure as an exhibit. **See** Amended Complaint, 11/11/19, at 5; Exhibit 4.

While the trial court ultimately rejected FWH's position concerning the contractual preclusion of Tedesco's' entitlement to lost profit and overhead, the foregoing procedural history highlights the principal flaw in the majority's current position. As demonstrated by Tedesco's original complaint, this lawsuit did not concern the non-payment of Payment Application No. 2, but rather, it involved the determination of the appropriate amount of damages due to

Tedesco for FWH's breach of contract. From my perspective, utilizing CASPA to penalize an owner for refusing to pay a legitimately-disputed demand for unliquidated damages chills the ability of an owner or any other "party with whom the contractor . . . has contracted," to litigate a legitimate contract dispute. *See* 73 P.S. § 504. How can it be explained that a party is afforded the right to raise a legitimate defense to a civil complaint seeking unliquidated damages for a breach of contract and still be subject to CASPA's penalty provisions for the non-payment of the identical contested damages simply because the contractor submitted a pay application after the fact? Plainly, it cannot, and the majority's contrary interpretation runs counter to the central, unambiguous premise that performance in accordance with the contract entitles the contractor to payment and that the failure to pay the uncontested sum is the ill to be remedied. Nothing, in the plain language of the statute provides, much less suggests, that a party to a lawsuit will be penalized for its legitimate dispute as to the amount of damages. In validating Tedesco's reliance upon Payment Application No. 2 as the basis for applying CASPA in this case, the majority is effectively denying owners the ability to contest unliquidated damages because if they refuse to pay the disputed amount they will risk being sanctioned with augmented interest, penalty interest, counsel fees, and litigation costs pursuant to the provisions outlined in CASPA.

Thus, for both of the foregoing reasons, I respectfully dissent from my colleagues' decision to extend CASPA's application to cases where, as here,

there is no outstanding payment due for performance rendered. CASPA simply does not apply to a dispute over unliquidated damages. Thus, I would vacate the judgment entered on the molded verdict and direct the trial court to enter judgment on the $401,046.00 verdict awarded by the jury.